George MOSS, Marijuana Reform Party, Thomas K. Leighton, Jeffrey C. Wright, and Corinne E. Kurtz, Plaintiff,

v.

CABLEVISION SYSTEMS CORPORATION, A Delaware Corporation, Defendant.

No. 98 CV 5985(ADS).

United States District Court, E.D. New York.

Oct. 7, 1998.

Law Offices of Thomas J. Hillgardner, Flushing, NY by Thomas J. Hillgardner, for Plaintiffs.

Rivken, Radler & Kremer, Uniondale, NY, by William M. Savino, Stephen J. Smirti, Jr., for Defendant.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This is another chapter in the cable television era. The plaintiffs, George Moss, the Marijuana Reform Party ("MRP"), Thomas K. Leighton, Jeffrey C. Wright, and Corinne E. Kurtz (collectively, the "plaintiffs" or "Moss") filed this motion by order to show cause for a preliminary injunction, seeking an order compelling the defendant Cablevision

Systems Corporation (the "defendant" or "Cablevision") to permit plaintiffs to cablecast on a local public access channel, a segment of The Hippie Talk Show ("The Show"), which contains pictures and voices of legally qualified candidates for public office.

## I. BACKGROUND

Initially, the Court notes that there are no disputed factual issues. In addition, neither party requested a hearing. Thus, no hearing is required. George Moss is an independent television producer of The Show. In the past, The Show has appeared on Cablevision's public access channel. A public access channel is also referred to as a public, educational, or governmental channel ("PEG"). By statute, a public access channel is defined as a channel "designated for noncommercial use by the public on a first come, first served, nondiscriminatory basis." 9 N.Y.C.R.R. § 595.4(a)(1). Public access channels "are channels that over the years, local governments have required cable system operators to set aside for public, educational, or governmental purposes as part of the consideration an operator gives in return for permission to install cables under the city streets and to use public rights-of-way." *Denver Area Educ. Telecomm. Consortium, Inc. v. Federal Communications Comm'n*, 518 U.S. 727, 734, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996) (citations omitted) (*"Denver Area"*).

Recently, Moss taped a segment of the show that featured a forum for candidates of the Marijuana Reform Party ("MRP"). The candidates, who will be on the November 3, 1998 election ballot, include Thomas K. Leighton, Jeffrey C. Wright and Corrine E. Kurtz ("the candidates") who presently are running, respectively, for Governor, Lieutenant Governor, and United States Senator. The taped segment which Moss seeks to air "would be a forum for the candidates of the MRP to appear on camera and express their views on the issues of the day . . . ." (Plaintiffs complaint ¶ 16).

Cablevision claims that they have denied the plaintiffs the opportunity to broadcast The Show segment featuring the MRP until after the election, due to their "general policy" of excluding all qualified candidates for public office from broadcasting on the public access channel during the sixty day period preceding the election. Cablevision's "policy" is derived from their franchise agreement with the Town of Brookhaven, in which paragraph 15.3 states, "[Cablevision] shall proffer a reasonable policy which shall . . . prohibit access for commercial speech." Cablevision also points to their "Access User Contract" ("the contract") and "Cablevision Systems Corporation Public, Educational and Governmental Access Rules" ("the rules") in support of their "policy." The contract states that the "[a]pplicant warrants that its cablecast presentations on the cable television shall not include . . . any material presented by or on behalf of or against a Legally Qualified Candidate." The rules state that "[a]ny audio or visual material [that] promotes or is designed to promote the sale of commercial products or services (including advertising by or on behalf of, or in opposition to, candidates for public service) is prohibited in connection with any Access programming."

Moss claims that Cablevision's prohibition constitutes a violation of the Cable Communications Policy Act of 1984 ("The Cable Act"), 47 U.S.C. § 527 et seq., specifically, 47 U.S.C. § 531(e) ("section 531[e]") and New York Public Service Law § 229(3) ("section 229[3]")", in that Cablevision has unlawfully censored the content of the presentation of the public access channel. Further, Moss argues that if he is not permitted to air the new segment of The Show featuring a forum for the MRP, he will never have the opportunity to express the views of the MRP on Cablevision, prior to the November 3, 1998 election.

In opposition, Cablevision first contends that The Show segment featuring the MRP would amount to a campaign advertisement, which constitutes a commercial use of their public access channel. Thus, they argue, Cablevision's policy of prohibiting broadcasting of political candidates sixty days prior to the election does not constitute unlawful editorial control. Cablevision also claims that the plaintiffs' motion for a preliminary injunction should be denied as they have failed to exhaust their administrative remedies. In

addition, Cablevision argues that the plaintiffs have not shown that they would be irreparably harmed if the Court denied their motion.

## II. DISCUSSION

### A. The Standard for Granting a Preliminary Injunction

A preliminary injunction is considered an "extraordinary" remedy that should not be granted as a routine matter. *See JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 80 (2d Cir.1990); *Hanson Trust PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264, 273 (2d Cir.1986); *Medical Soc'y of the State of New York v. Toia*, 560 F.2d 535, 538 (2d Cir.1977); *Wandyful Stadium, Inc. v. Town of Hempstead*, 959 F.Supp. 585, 591 (E.D.N.Y.1997). Ultimately, however, the decision to grant or deny this "drastic" remedy rests in the district court's sound discretion. *See American Exp. Fin. Advisors Inc. v. Thorley*, 147 F.3d 229, 231 (2d Cir.1998); *Molloy v. Metropolitan Transp. Auth.*, 94 F.3d 808, 811 (2d Cir.1996).

In the seminal case of *Jackson Dairy, Inc. v. HP Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam), this Circuit set forth the applicable standard in this Circuit to obtain preliminary injunctive relief. According to *Jackson Dairy*, the movant must clearly establish the following: "(a) irreparable harm; and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and the balance of hardships tips in favor of the movant." *Id.; see also Alliance Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.*, 143 F.3d 688, 696 (2d Cir.1998); *Maryland Casualty Co. v. Realty Advisory Bd. on Labor Relations*, 107 F.3d 979, 984 (2d Cir.1997).

A showing of irreparable harm is considered the "single most important requirement" in satisfying the standard. *See Alliance Bond Fund, Inc.*, 143 F.3d at 696; *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir.1990) (recognizing that "irreparable harm is the single most important prerequisite for the issue of a prelimi-

nary injunction"). "A moving party must show that the injury it will suffer is likely and imminent, not remote or speculative, and that such injury is not capable of being fully remedied by money damages." *National Ass'n for Advancement of Colored People, Inc. (NAACP) v. Town of East Haven*, 70 F.3d 219, 224 (2d Cir.1995) (citing *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 [2d Cir.1989] ); *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) ("The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies"). The movant must establish more than a mere "possibility" of irreparable harm. Rather, he must show that irreparable harm is "likely" to occur. *JSG Trading Corp.*, 917 F.2d at 79.

If the Court finds that the moving party would be irreparably harmed if injunctive relief were not granted, the second step of the inquiry requires that the movant demonstrate a likelihood of success on the merits. This analysis, however, requires a heightened standard where the preliminary injunction grants the moving party essentially all the relief he seeks. In such a case, the moving party "must show a *substantial likelihood* of success on the merits, rather than merely a likelihood of success." *Johnson v. Kay*, 860 F.2d 529, 540 (2d Cir.1988); *See also Hevesi v. Metropolitan Transp. Auth.*, 827 F.Supp. 1069, 1071 (S.D.N.Y.1993). Finally, Fed. R.Civ.P. 52(a) requires that the district court sufficiently set forth its findings to permit appellate review. *See Rosen v. Siegel*, 106 F.3d 28, 32 (2d Cir.1997); *Society for Good Will to Retarded Children, Inc. v. Cuomo*, 902 F.2d 1085, 1088 (2d Cir.1990). The Court will address each of these requirements in turn.

#### 1. *Irreparable Harm*

Moss contends that if he is denied injunctive relief he will be unable to air The Show featuring a forum on the MRP, thus stifling the views of the MRP prior to the November 3, 1998 election. In addition, Moss contends that in the absence of injunctive relief, his statutory rights to air non-obscene program-

**4**

ming will be violated. Finally, Moss claims that he has no other adequate remedy at law and that money damages would not be a complete remedy for the alleged wrongdoing by Cablevision. On the other hand, Cablevision submits that money damages would be an appropriate remedy if it can be shown that they violated the plaintiffs statutory rights. Furthermore, Cablevision contends that Moss could air The Show if he pays for the air time, and then could sue Cablevision for a refund. In fact, at oral argument, Cablevision's counsel stated that Moss could purchase Cablevision time on another channel for approximately $85.

■ In the Court's view, there would be irreparable harm to the plaintiffs if they are denied a preliminary injunction ordering Cablevision to air the segment of The Show featuring the MRP. The loss of opportunity for expression of political ideas, especially in the context of political speech just prior to the November election, unquestionably constitutes irreparable injury because of the value placed on freedom of speech in the market place of ideas. Moreover, Cablevision's decision to prohibit Moss from airing The Show will cause irreparable harm to the plaintiffs as their ideas and positions will not be aired on the public access channel prior to the November, 1998 election. Cablevision contends that Moss could air The Show if he pays Cablevision and shows it on a "regular" channel. Cablevision's argument, however, taken to its logical conclusion would hold true for every person who appears on their public access channel—thus preventing the Court from ever issuing a preliminary injunction in favor of a litigant who claims that Cablevision has denied their access to the public access channel. The ultimate question to be asked is not what other remote options or even less remote options are available to the plaintiffs to air their views, the issue is whether irreparable harm is *likely* to occur to the plaintiffs if Cablevision is not ordered to permit airing of the show on the public access channel. Under these guidelines, the Court is convinced that the plaintiffs are likely to suffer irreparable harm if the motion for the preliminary injunction were denied.

It is also clear that should the Court deny the plaintiffs' request for injunctive relief, the injury would be likely and imminent, not remote or speculative. Obviously, this is true because the election is only four weeks away and if the injunction were not granted, the plaintiffs would not be able to air The Show on their public access channel prior to the general election. Finally, the situation would not be remedied adequately by monetary damages. Money damages at a later date will not permit Moss to go back in time and air the segment of The Show on the public access channel featuring the MRP prior to the November 3, 1998 election. Clearly, the only satisfactory remedy to the plaintiffs, if they are so entitled, is that they be permitted to air the show on a first come, first serve basis in accordance with the provisions of 47 U.S.C. § 531(e) and N.Y.Pub. Serv.Law § 229(3) on the public access channel.

Therefore, in the Court's view, the plaintiffs clearly have demonstrated irreparable harm would likely occur if the Court denied their motion for injunctive relief ordering Cablevision to permit the airing of the segment of The Show featuring the MRP prior to the November 3, 1998 election on the public access channel.

### 2. Likelihood of Success

■ The second step of the inquiry requires that the movant demonstrate a likelihood of success on the merits. This analysis, however, requires a heightened standard where the preliminary injunction grants the moving party essentially all the relief he seeks. As stated above, in such a case the moving party "must show a *substantial* likelihood of success." *Johnson v. Kay*, 860 F.2d at 540; *see also Hevesi v. Metropolitan Transp. Auth.*, 827 F.Supp. at 1071 (emphasis added). The most complete remedy available for the plaintiffs is if the Court grants their motion for a preliminary injunction and orders Cablevision to air the segment of The Show featuring the MRP. Since this outcome would give the plaintiffs essentially all the relief they ultimately request, the Court is mindful that it must apply the heightened

standard of "a substantial likelihood of success."

The plaintiffs contend that there exists a private cause of action, pursuant to 47 U.S.C. § 531(e) and N.Y.Pub.Serv.Law § 229(3), against Cablevision for exercising editorial control over the use of its public access channel. Specifically, the plaintiffs submit that Cablevision was in violation of sections 531(e) and 229(3) when they refused to air, on its public access channel, The Show segment featuring candidates from the MRP. On its part, Cablevision contends that The Show amounts to a political commercial that is beyond the scope of a public, educational or governmental channel. Cablevision argues, therefore, that they can refuse to air the segment of The Show featuring qualified candidates of the MRP because it is commercial speech. In addition, Cablevision submits that this Court lacks jurisdiction as the plaintiffs have failed to exhaust their administrative remedies.

We start by examining the statutory language. Section 531(e) states, in pertinent part, that "a cable operator shall not exercise any editorial control over any public, educational, or governmental use of channel capacity ... except a cable operator may refuse to transmit any public access program or portion of a public access program which contains obscenity, indecency, or nudity." 47 U.S.C. § 531(e). Section 229(3) states that "[n]o cable television company may prohibit or limit any program or class or type of program presented over a leased channel or any channel made available for public access or educational purposes." N.Y.Pub.Serv. Law § 229(3)

The Second Circuit has made it clear that an implied private cause of action in the Federal Court exists against a cable company provider that exercises editorial control over use of its public access channel in violation of section 531(e). *See McClellan v. Cablevision of Conn. Inc.*, 149 F.3d 161, 164–165 (2nd Cir.1998); *see also Glendora v. Cablevision Sys. Corp.*, 893 F.Supp. 264 (S.D.N.Y.1995). In *McClellan*, the Second Circuit recently set forth a detailed analysis supporting their position that an implied private cause of action exists for violating section 531(e) of the Cable Act. In their analysis of *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Second Circuit found that "Because Congress prohibited cable operators from exercising editorial control over public access programming and because Congress clearly concerned itself with the interests of producers of programs broadcast on public access channels, we conclude that the appellant falls within the class of intended beneficiaries of § 531(e)." *McClellan*, 149 F.3d at 165. In reaching this conclusion, the Second Circuit "disagree[d] ·with the district court's assertion that Congress purposefully withheld a private federal remedy in favor of exclusive enforcement of § 531(e) by local authorities.... It is clear from these provisions that had Congress intended to extend the tradition of local franchising authority regulation of cable operators to include enforcement of § 531(e), Congress knew how to do so and could have done so by making an explicit reservation." *Id.* at 155–56. The Court emphasized that, "[t]he language in *Denver* reinforces the finding that, by enacting § 531(e), Congress specifically intended to withhold from cable operators the authority to exercise editorial control consistent with the history of public access channels [and that this] cause of action is not one traditionally left to state control in an area that is basically the concern of the states." *Id.* at 167–68.

Given the considerations clearly expressed in *McClellan*, the Court is not persuaded by Cablevision's argument that the plaintiffs must exhaust their state administrative remedies before seeking a preliminary injunction in this Court. Initially, the Court is concerned that such a finding would, with reasonable certainty, prevent the plaintiffs from airing The Show prior to the November 3, 1998 election. In addition, it was brought out by plaintiffs counsel during oral argument that the exhaustion issue would be relevant only to the state law provision. However, adhering to *McClellan*, Congress specifically empowered the federal courts to prevent such editorial control.

Since it is clear that section 531(e) contains an implied private cause of action, the only remaining question is whether there

is a substantial likelihood that the plaintiffs would succeed on the merits of their claim. It is the most basic rule of statutory interpretation that when the words of a statute are clear, they should be followed. *See Landreth Timber Co. v. Landreth,* 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985); *Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Aslanidis v. U.S. Lines, Inc.,* 7 F.3d 1067 (2d Cir.1993). The language of section 531(e) is clear and unambiguous: "A cable operator shall not exercise any editorial control over any public, educational, or governmental use of channel capacity ... except a cable operator may refuse to transmit any public access program or portion of a public access program which contains obscenity, indecency, or nudity." 47 U.S.C. § 531(e). While the Court has not had the opportunity to view The Show segment that features candidates from the MRP, no argument has been made by Cablevision that it contains obscenity, indecency, or nudity. Therefore, the plain meaning of the Congressional statute prohibits Cablevision from exercising editorial control over programming on the public access channel that is not obscene, indecent, or that contains nudity. While Cablevision's "sixty day policy," may be non-discriminatory since it treats all qualified candidate equally, it nonetheless conflicts with the plain meaning of the statute.

In addition, the Court disagrees with Cablevision's argument that The Show amounts to commercial speech which is lawfully prohibited by Cablevision on the public access channel. Contrary to Cablevision's position, the Court finds that there is a substantial likelihood that the prohibition against televising The Show would amount to exercising editorial control over public, educational, or governmental use of the public access channel. In the Court's view, The Show is non-commercial speech. The Second Circuit has held that "as to programming within the PEG categories, section 531(e) prohibits the cable operator from exercising any 'editorial control,' and courts enforcing the outer limits of PEG categories must be alert not to permit a cable operator to bar disfavored programming under the guise of enforcing such

limits." *Time Warner Cable of N.Y. City v. Bloomberg L.P.,* 118 F.3d 917, 928 (2d Cir. 1997).

Furthermore, the Supreme Court has differentiated between political speech and commercial speech. *See, e.g., Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). The First Amendment reflects a "profound national commitment" to the principle that "debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Protecting political speech on public issues has been a central concern of the Supreme Court. *see e.g., Connick v. Myers,* 461 U.S. 138, 145, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). The MRP is not selling a product or a service. They are a political party seeking to express their political views prior to the November 3, 1998 election. Significantly, Cablevision conceded, during oral argument, that if the plaintiffs' speech were noncommercial, the Court would be obligated to grant the motion for a preliminary injunction. Moreover, counsel for Cablevision could not cite a case that supported its theory that political expression was commercial speech. The Court finds that the content of The Show is noncommercial speech.

Thus, the plaintiffs have established a substantial likelihood of success on the merits of its lawsuit, namely that Cablevision violated section 531(e) of the The Cable Act and section 229(3) of the New York Public Service Law when they refused to allow Moss to air The Show segment featuring candidates from the MRP on the public access channel.

### III. CONCLUSION

After reviewing the parties' submissions, and hearing oral arguments, and for the reasons set forth above, it is hereby

**ORDERED,** that the Plaintiffs' motion for a preliminary injunction directing the defendant Cablevision to permit the airing on their public access channel, only on a first come first serve basis, of The Hippie Talk Show

featuring candidates of the Marijuana Reform Party, is granted.

**SO ORDERED.**