Robert M. GOLDBERG, Plaintiff,

v.

CABLEVISION SYSTEMS CORPORATION, a Delaware Corporation, Town Board of the Town of Oyster Bay, the legislative branch of the Town of Oyster Bay, a municipal corporation, and the Public Service Commission of the State of New York, an executive agency of the State of New York, Defendants.

No. 01 CV 4223(ADS)(ETB).

United States District Court,
E.D. New York.

March 23, 2002.

Thomas J. Hillgardner, Esq., Jamaica, NY, Attorney for the Plaintiff.

Satterlee Stephens Burke & Burke, LLP, Robert M. Callagy, Esq., Anne Ber-rill Carroll, Esq., Of Counsel, New York, NY, Attorneys for the Defendant Cablevision Systems Corporation.

Office of the Town Attorney, Town of Oyster Bay, by Marilyn Oshansky, Assistant Town Attorney, Donna B. Swanson, Assistant Town Attorney, Oyster Bay, NY, Attorneys for the Defendant Town Board of the Town of Oyster Bay Town Hall.

Lawrence G. Malone, Esq., General Counsel, by Jonathan D. Feinberg, Assistant Counsel, Carl Patka, Assistant Counsel, Albany, NY, Attorney for the Defendant Public Service Commission of the State of New York.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This action arises out of claims by Robert M. Goldberg ("Goldberg" or the "plaintiff") that Cablevision Systems Corporation ("Cablevision" or a "defendant") violated the Cable Communications Policy Act of 1984 (the "Cable Act"), 47 U.S.C. § 521, *et. seq.;* 42 U.S.C. § 1985; and the New York Public Service Law ("N.Y.Pub. Serv.L.") by refusing to air his programs on their public access channel until he signed an access user contract. Goldberg also claims that the Town Board of the Town of Oyster Bay (the "Town Board" or a "defendant") and the New York State Public Service Commission ("NYSPSC") violated 42 U.S.C. § 1983 by delegating to Cablevision the power to adopt rules and regulations for the use of its production facilities and its public, educational, and governmental channel capacity.

### I.  BACKGROUND

The following facts are taken from the amended complaint, the documents incorporated therein by reference, and matters of which judicial notice may be taken. *See Leonard F. v. Israel Discount Bank of*

*N.Y.,* 199 F.3d 99, 107 (2d Cir.1999) (holding that in deciding a motion to dismiss the complaint, a Court may consider, among other things, facts stated on the face of the complaint, documents incorporated in the complaint by reference, and matters of which judicial notice may be taken); *Hayden v. County of Nassau,* 180 F.3d 42, 54 (2d Cir.1999) (same).

## A. Statutory Framework

Cable television operators, such as the defendant Cablevision, are regulated by the Cable Act, 47 U.S.C. § 521, *et. seq.;* state law, *see* N.Y. Pub. Serv. Law, Art. 11; and the Official Compilation of Codes, Rules, and Regulations of the State of New York, *see* 9 NYCRR pt. 595. To the extent that the state and federal statutes differ, the federal statutes control. *See Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 698–700, 104 S.Ct. 2694, 2699–2701, 81 L.Ed.2d 580 (1984), *Cable Television Ass'n of New York, Inc. v. Finneran,* 954 F.2d 91, 97–98 (2d Cir.1992).

Pursuant to the Cable Act, any "governmental entity empowered by Federal, State, or local law to grant a franchise," 47 U.S.C. § 522(10), may provide a cable operator with the authorization to construct or operate a cable system, *see* 47 U.S.C. § 522(9) (defining franchise). Cable operators must comply with the terms of the resultant franchise agreement in addition to following federal and state law.

The Cable Act permits franchising authorities, typically a local government or municipality, to require cable operators to provide public, educational, and governmental ("PEG") channel capacity on their systems. *See* 47 U.S.C. §§ 531(a); *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC,* 518 U.S. 727, 734, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996) (noting that local governments require cable system operators to set aside channels for PEG use in exchange for "permission to install cables under city streets and to use public rights-of-way"). The Cable Act also allows franchising authorities to require cable operators to establish rules and procedures for the use of the channel capacity designated for PEG programming. *See* 47 U.S.C. § 531(b). However, the Cable Act prohibits cable operators from exercising "any editorial control over any public, educational or governmental use of channel capacity provided pursuant to this section, except a cable operator may refuse to transmit any public access program or portion of a public access program which contains obscenity, indecency, or nudity." 47 U.S.C. § 531(e).

The NYSPSC is responsible for regulating the cable television industry in New York state. *See* N.Y. Pub. Serv. Law §§ 211, 215. The NYSPSC promulgates minimum standards that are incorporated by law into every franchise agreement. *See* N.Y. Pub. Serv. Law § 215(b); *Goldberg v. Cablevision Systems Corp.,* 261 F.3d 318, 320 (2d Cir.2001). Those standards include "provisions regarding access to, and facilities to make use of, channels for ... public service programs." N.Y. Pub. Serv. L. § 215(2)(b); *Goldberg,* 261 F.3d at 320.

State regulations provide that New York cable operators with a capacity of 21 or more channels must designate at least one full-time channel for public access and at least one full-time channel for educational and governmental use. *See* 9 NYCRR § 595.4(b)(1). The regulations define "public access channel" as a "channel designated for noncommercial use by the public on a first-come, first-served, nondiscriminatory basis." 9 NYCRR § 595.4(a)(1). Similar to federal law, the state regulations prohibit franchisees and municipalities from exercising "any editorial control over any public, educational or governmental use of channel capacity des-

ignated for PEG purposes." 9 NYCRR § 595.4(c)(8), (9). In addition, § 229(3) of the Public Service Law prohibits cable operators from barring or limiting "any program or class or type of program presented over a . . . channel made available for public access." N.Y. Pub. Serv. Law § 229(3).

## B. The Franchise Agreement

Cablevision has a Franchise Agreement ("Agreement") with the Town of Oyster Bay (the "Town") to provide cable television service to residents of the Town. Pursuant to this Agreement, which was approved by the NYSPSC, Cablevision must make available and activate two channels dedicated to PEG access (*see* Affidavit of Robert M. Goldberg in Support of Plaintiff's Motion for a Preliminary Injunction [Goldberg Affidavit], Exhibit 1, Franchise Agreement ¶ 16.12). Under this Agreement, a PEG Access Channel is a "channel . . . on which non-commercial PEG Access programming is cablecast" (*see* Franchise Agreement ¶ 1.20). The agreement defines PEG access as: "the right to public, educational and governmental access that Town residents, its schools, its libraries, as well as the Town government have to submit noncommercial programs to the Franchisee for cablecasting on PEG Access channels in accordance with rules established and administered by the FCC, NYSPSC an the Franchisee" (Franchise Agreement ¶ 1.18).

Pursuant to the Agreement, Cablevision is "responsible for developing, implementing, interpreting and enforcing rules for PEG Access Channel use which shall insure that PEG Access Channel(s) and PEG Access Equipment will be available on a first-come non-discriminatory basis" (*see* Franchise Agreement ¶ 16.4). The Agreement directs Cablevision to comply with federal and state laws regarding PEG access (*see* Franchise Agreement ¶¶ 16.1, 26.1, 32.1). The terms and conditions of the Agreement are subject to federal and state law as well as FCC and NYSPSC regulations (*see* Franchise Agreement ¶ 5.1).

## C. The First Public Access Contract

Goldberg is a resident of Oyster Bay who offers independently produced television programming to be shown on the public access channel designated by the Agreement between Cablevision and the Town. During an unspecified period of time prior to April 1, 2001, the plaintiff and Cablevision entered into an Access User Contract ("First Access User Contract") (*see* Goldberg Affidavit, Exhibit 2, First Access User Contract). By signing the First Access User Contract, Goldberg agreed to abide by Cablevision's Access Rules; to reimburse the company for any damage he may cause to Cablevision's equipment and facilities; to reimburse or indemnify Cablevision for any liability that might arise out of the violation of the intellectual property rights of third parties; and to provide programs for cablecasting that do not include obscene or indecent material or advertisements for a lottery (*see* First Access User Contract). The Court was not provided with a copy of the Access Rules upon which the First Access User Contract was based.

## D. The Access User Contract

According to the amended complaint, on an unspecified date prior to April 1, 2001, Cablevision demanded that Goldberg enter into a new Access User Contract that was based on a revised set of access user rules, policies, procedures, and guidelines ("Access User Contract") (*see* Goldberg Affidavit, Exhibit 3, Access User Contract). Goldberg attached a copy of the revised access user rules to his affidavit in support of his motion for a preliminary injunction upon which the Court is ruling in the

present decision (*see* Goldberg Affidavit, Exhibit 3, Cablevision Public, Educational, and Governmental Access Rules).

The Access User Contract provides, among other things, that public access programmers, such as the plaintiff, agree to abide by Cablevision's Access Rules, including the technical specifications set forth in the Rules (*see* Access User Contract, ¶¶ 1, 2). By signing the Access User Contract, the public access programmer warrants that his cablecast presentations do not contain obscene material, advertisements for a lottery, or commercial transactions and agrees to submit his program to Cablevision which may edit out any such prohibited material (*see* Access User Contract ¶¶ 2, 7(b)). The programmer assumes responsibility for all music synchronization rights for the music contained in his presentation and agrees to provide Cablevision with the title and composer of the musical arrangements incorporated in his presentation (*see* Access User Contract ¶ 3).

In addition, the programmer agrees to indemnify Cablevision for any liability, loss, or damage arising out of any material he supplies to Cablevision in connection with his use of Cablevision's public access channel and with regard to his use of Cablevision's production facilities (*see* Access User Contract ¶¶ 4, 5). The programmer also agrees to indemnify Cablevision for any liability, loss, or damage it may suffer due to the programmer's violation of the intellectual property rights of third parties (*see* Access User Contract ¶ 6). The programmer assumes responsibility for the proper care of Cablevision's production facilities and agrees to repair or replace any Cablevision equipment he damages (*see* Access User Contract ¶ 7(a)).

By signing the Access User Contract, the programmer also agrees to defend any action to which an indemnity applies (*see* Access User Contract ¶ 8) and to release Cablevision from any legal action, claims, or demands the programmer "ever had, has and may have" (Access User Contract ¶ 9). The programmer agrees not to use the name "Cablevision" when publicizing the programs he intends to cablecast (*see* Access User Contract ¶ 14). The programmer also stipulates that his programs will be used only for public access cablecasting and "will not be exploited for profit, nonpolitical or commercial fundraising in any fashion" (Access User Contract ¶ 10). According to the Access User Contract, Cablevision must review any material a programmer uses to promote his presentation (*see* Access User Contract ¶ 11).

On March 29, 2001, Goldberg signed the Access User Contract and an Access User Application and submitted them to Cablevision so that he could cablecast one of his programs on Cablevision's public access channel. However, Goldberg added the following language to the Access User Contract and Access User Application: "Nothing is or has been agreed to that is not in accord with United States and New York State law or that would waive my rights that would otherwise apply." Goldberg alleges that on April 1, 2001, Cablevision unilaterally revoked the First Access User Contract.

On April 3, 2001, one Dianne Bennett ("Bennett"), an Access Supervisor at Cablevision, wrote Goldberg a letter stating that Cablevision was unable to accept his Access User Contract and Application because he had made "unilateral additions/deletions, amendments or comments to either/both of these documents." Bennett returned to Goldberg five of the eight Access User Contracts and Applications he had submitted. She also provided him with clean copies of both documents and invited him to submit them in accordance with Cablevision's Rules. Goldberg alleges that Cablevision refuses to cablecast any of his programs until he signs the

Access User Contract without adding his proposed language.

The amended complaint raises six causes of action. As a first cause of action, Goldberg claims that Cablevision has violated the Cable Act by refusing to cablecast his programs without a signed contract, because such conduct constitutes the type of "editorial control" prohibited by 47 U.S.C. § 531(e). In his second cause of action, Goldberg alleges that the same conduct violates N.Y. Pub. Serv. Law § 229(3). The third cause of action contends that Cablevision breached a contract with Goldberg by refusing to cablecast his programs. The fourth cause of action alleges that when the Town Board and NYSPSC delegated to cable operators the power to adopt rules and regulations for the use of public access television, they violated 42 U.S.C. § 1983, because they acted with deliberate indifference to the inherent and inevitable threat to the plaintiff's statutory right to be free from "editorial control" in connection with public access programming. In his fifth cause of action, Goldberg claims that Cablevision violated 42 U.S.C. § 1985. The sixth cause of action seeks a declaration of the rights of the parties pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

Presently before the Court are: (1) a motion by the plaintiff for a preliminary injunction; (2) a cross-motion by the defendant Cablevision to dismiss the complaint as against Cablevision pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed.R.Civ.P."); and (3) a cross-motion by the plaintiff to amend the complaint pursuant to Rule 15(a) of the Fed.R.Civ.P.

## II. *DISCUSSION*

### A. The Motion by Cablevision to Dismiss the Complaint Pursuant to Rule 12(b)(6)

On a motion to dismiss for failure to state a claim, the Court should dismiss the complaint pursuant to Rule 12(b)(6) if it appears beyond doubt that the plaintiff can prove no set of facts in support of his complaint which would entitle him to relief. *See King v. Simpson*, 189 F.3d 284, 286 (2d Cir.1999); *Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir.1996). As noted above, the Court must confine its consideration "to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Israel Discount Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir.1999); *Hayden v. County of Nassau*, 180 F.3d 42, 54 (2d Cir.1999). The Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Koppel v. 4987 Corp.*, 167 F.3d 125, 127 (2d Cir.1999); *Jaghory v. New York State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir.1997). The issue to consider is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. *See Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir.1995). Indeed, it is not the Court's function to weigh the evidence that might be presented at trial; instead, the Court must merely determine whether the complaint itself is legally sufficient. *See Villager Pond*, at 378.

### 1) As to the Claim Brought Pursuant to the Cable Act, 47 U.S.C. § 531(e)—The First Cause of Action

█ Cablevision moves to dismiss the plaintiff's claim for a Cable Act violation on the ground that requiring programmers to sign an Access User Contract and Access User Application before their programs are cablecast does not constitute the "editorial control" that is prohibited by 47 U.S.C. § 531(e). On the other hand, Goldberg argues that he has stated a claim

by alleging that Cablevision has refused to cablecast his programs.

Section 531(e) of the Cable Act provides that:

> [A] cable operator shall not exercise any editorial control over any public, educational, or governmental use of channel capacity provided pursuant to this section except a cable operator may refuse to transmit any public access program or portion of a public access program which contains obscenity, indecency, or nudity.

47 U.S.C. § 531(e). The express purpose of this section is to "assure that cable communications provide and are encouraged to provide the widest possible diversity of information sources and services to the public." 47 U.S.C. § 521(4). In passing this legislation, Congress intended the absence of editorial control to further the goal of public access channels, which is to "provide groups and individuals who generally have not had access to the electronic media with the opportunity to become sources of information in the marketplace of ideas." H.R.Rep. No. 98–934, at 30 (1984), *reprinted in* 1984 U.S.C.C.A.N. at 4667.

The Second Circuit has interpreted the prohibition against editorial control set forth in § 531(e) to mean that cable operators are precluded "from attempting to determine the content of programming that is within the PEG categories." *Time Warner Cable v. Bloomberg, L.P.,* 118 F.3d 917, 928 (2d Cir.1997). However, the Second Circuit has "rejected the notion 'that the operator is barred from enforcing' the contractual and state-law provisions pursuant to which PEG access is defined." *Goldberg v. Cablevision,* 261 F.3d 318, 325 (2d Cir.2001) (quoting *Time Warner,* 118 F.3d at 928). Put differently, although section 531(e) prohibits a cable operator from exercising any "editorial control" as to programming within the PEG catego-

ries, "cable operators may enforce the boundaries of the categories they are obliged to offer ... without violating section 531(e)." *Time Warner,* 118 F.3d at 929.

Applying these principles to the facts of this case, the Court finds that Cablevision's refusal to cablecast Goldberg's programs without a signed and unaltered Access User Contract from Goldberg does not constitute an exercise of editorial control. The decision not to cablecast the plaintiff's programs was not based on the nature or content of the programs. *See Time Warner,* 118 F.3d at 928 (holding that § 531(e) precludes cable operators "from attempting to determine the content of programming that is within the PEG categories").

Rather, Goldberg alleges that Cablevision refused to cablecast his programs because he failed to submit a signed and unaltered Access User Contract. Given that Cablevision's unwillingness to cablecast the plaintiff's programs was not related to the content or nature of the presentations, Cablevision's conduct cannot be considered editorial control. *See Time Warner,* 118 F.3d at 928; *Glendora v. Marshall,* 947 F.Supp. 707, 712 (S.D.N.Y. 1996) (holding that where the plaintiff failed to demonstrate how a change in the method for disseminating her program to the public affects the content or substance of her show, her § 531 claim must fail); *Glendora v. Hostetter,* 916 F.Supp. 1339, 1342 (S.D.N.Y.1996) (finding that where Cablevision reduced the number of times per month every programmer's series could be cablecast to two, the Court could not conclude that the cable operator exercised editorial control over the plaintiff's programs); *see, e.g., Glendora v. Levin,* No. 01–1776, 2001 WL 1587415 (6th Cir. Dec.11, 2001) (finding that cable operator's requirement that a programmer have a

local sponsor does not constitute editorial control in violation of § 531(e)); *Glendora v. Malone*, No. 96–7068, 1996 WL 678982 (2d Cir. July 25, 1996) (holding that where the cable operator changes the manner in which the plaintiff's program is cablecast in such a manner that the plaintiff retains access to public access channels but without the same system-wide audience and convenience, the conduct of the cable operator is not the impermissible exercise of editorial control). *Cf. Moss v. Cablevision Systems Corp.*, 22 F.Supp.2d 1, 6 (E.D.N.Y.1998) (finding that Cablevision's policy of prohibiting all qualified political candidates from submitting programs for cablecast on public access channels 60 days prior to an election constitutes the exercise of editorial control prohibited by § 531(e)).

Further, Cablevision's contract requirement is nothing more than the company's attempt to enforce their rules, which action is mandated by the Town and permitted by the Cable Act. By signing the Access User Contract, a programmer agrees, among other things: to abide by Cablevision's Access Rules; to submit programs that do not contain obscene material, advertisements for a lottery, or commercial transactions; to obtain the proper authorization to cablecast copyrighted material; to repair or reimburse Cablevision for damage to the company's equipment or property; to indemnify Cablevision for any liability, loss, or damage it may suffer due to the programmer's violation of the intellectual property rights of third parties; and to refrain from cablecasting programs "for profit, nonpolitical or commercial fundraising in any fashion" (Access user Contract ¶ 11).

These provisions, and the others detailed in the contract, demonstrate that Cablevision's Access User Contract is a means for the company to enforce their Access Rules, protect themselves from liability arising from the conduct of the pro-grammer, and ensure that programmers treated Cablevision's facilities and equipment with care. Requiring programmers to sign such a contract is not an attempt to control the content of PEG programs but, rather, an attempt to enforce the company's technical and procedural rules regarding PEG access channel use.

Implementing and enforcing basic rules of conduct for the submission and cablecasting of public access programming was clearly envisioned by Congress. The Cable Act specifically permits franchising authorities, such as the Town, to require cable operators to establish rules and procedures for the use of channel capacity designated for PEG programming. *See* 47 U.S.C. § 531(b). The Town clearly has delegated such authority to Cablevision. Further, Cablevision's Franchise Agreement with the Town, which was approved by the NYSPSC, states that Cablevision is "responsible for developing, implementing, interpreting and enforcing rules for PEG Access Channel use which shall insure that PEG Access Channel(s) and PEG Access Equipment will be available on a first-come non-discriminatory basis" (Franchise Agreement ¶ 16.4). Thus, where as here, a cable operator requires a programmer to sign an Access User Contract, which compels the programmer to follow the cable operator's access rules, before the cable operator will cablecast the programmer's shows, the cable operator is acting within the boundaries of 47 U.S.C. § 531(b), as opposed to violating 47 U.S.C. § 531(e).

This is not to say that the enforcement of every contract provision and access rule does not violate the prohibition against editorial control. By this decision, the Court does not purport to determine the legality of the Access User Contract or the Access Rules. Indeed, a situation may arise in which Cablevision's enforcement of a specific contract provision or Access

Rule does violate § 531(e). However, that is not the conduct Goldberg complains of here, and a decision on that issue would be purely speculative. Goldberg alleges only that the act of refusing to cablecast shows until the programmer signs an Access User Contract constitutes the exercise of editorial control. This Court holds that it does not.

To hold otherwise would render cable operators completely powerless to regulate how and when their facilities are used; to organize the submission and cablecasting of programs; to protect their property; and to limit their liability in intellectual property actions brought by third parties. *See generally Goldberg,* 261 F.3d at 325 (holding that a cable operator may refuse a submitted program that does not qualify as public access programming). Although it is well settled that cable operators are precluded "from attempting to determine the content of programming that is within the PEG categories," *Time Warner,* 118 F.3d at 928, the Cable Act does not bar them from "enforcing the contractual and state-law provisions pursuant to which PEG access is defined." *Goldberg,* 261 F.3d at 325; *see Time Warner,* 118 F.3d at 928 (holding that "cable operators may enforce the boundaries of the categories they are obliged to offer ... without violating section 531(e)"). Having given cable operators permission to establish rules and procedures for the use of public access channels, *see* 47 U.S.C. § 531(b), Congress must have expected the cable operators to implement and enforce those regulations. *See generally Time Warner,* 118 F.3d at 928.

The plaintiff relies on *McClellan v. Cablevision of Connecticut, Inc.,* 149 F.3d 161 (2d Cir.1998), in support of his opposition to the motion to dismiss the complaint. In particular, Goldberg refers to language in footnote 14 of the Second Circuit decision: "[Section] 531(e) provides no support for

Cablevision's refusal to broadcast *all* of McClellan's future programming—the strongest and broadest possible form of editorial control—because such action clearly falls outside of the statute's exception." *McClellan,* 149 F.3d at 168 n. 14. In *McClellan,* Cablevision indefinitely refused to broadcast any of the plaintiff's programs after he cablecast a show containing sexually explicit material. *Id.* at 162. As such, Cablevision's decision not to cablecast any of the plaintiff's programs was based on the content of one of his programs. However, here, Cablevision's decision not to cablecast Goldberg's programs is based solely on Goldberg's refusal to sign an Access User Contract. Thus, *McClellan* is distinguishable from the case at hand, and the Second Circuit's comment, in *dicta* contained in a footnote, that Cablevision's refusal to broadcast any of McClellan's future programming is the strongest form of editorial control, is inapposite.

Furthermore, in *McClellan,* the plaintiff could do nothing to persuade Cablevision to cablecast his programs, because Cablevision's decision was based on the content of one of McClellan's earlier shows. Here, on the other hand, if Goldberg's programs are not being cablecast, it is because Goldberg has not signed an unaltered Access User Contract to which he agrees except to the extent that it lacks his proposed language, not because of Cablevision's impermissible editorial control over the content of the programs. *See Glendora v. Marshall,* 947 F.Supp. 707, 720 (S.D.N.Y.1996).

The Court notes that Goldberg signed and submitted copies of the Access User Contract to which he added the following language: "Nothing is or has been agreed to that is not in accord with United States and New York State law or that would waive my rights that would otherwise ap-

ply." Goldberg unilaterally added this language to the contract, and Cablevision is not obligated to sign such a document or be bound by its terms. Moreover, the language Goldberg includes is vague and appears to be ambiguous. To the extent that the Court can discern the meaning of the proposed amendment, it seems that Goldberg is trying to ensure that he is not waiving any state or federal rights by signing the Access User Contract. The Court is of the view that the law continues to protect public access programmers who sign access user contracts that do not contain Goldberg's proposed amendment. Thus, in the Court's opinion, Goldberg's unilateral proposed amendment is superfluous and may be unnecessary. Given that Goldberg signed the otherwise unaltered contract, the Court sees no reason in the amended complaint why, in light of this knowledge, he would not sign the Access User Contract and continue cablecasting his programs.

Nevertheless, Cablevision's refusal to cablecast Goldberg's programs until he signs an Access User Contract does not constitute the exercise of editorial control as that phrase is defined in § 531(e). Because Goldberg does not allege any other conduct that would support a claim that Cablevision violated § 531(e), Cablevision's motion to dismiss the § 531(e) claim is granted.

### 2) As to the Claim Brought Pursuant to 42 U.S.C. § 1983—The Fourth Cause of Action

Cablevision also moves to dismiss the fourth cause of action, which is a claim brought pursuant to 42 U.S.C. § 1983. However, as the plaintiff points out in his opposition papers, this cause of action was not alleged against Cablevision. Accordingly, Cablevision's motion to dismiss the Section 1983 claim as against it is denied as moot.

### 3) As to the Claim Brought Pursuant to 42 U.S.C. § 1985—The Fifth Cause of Action

■ Cablevision moves to dismiss Goldberg's claim brought pursuant to 42 U.S.C. § 1985 on the ground that he provides no factual basis for his claim; he fails to allege that he is a member of a protected class; and he makes no allegations of a conspiracy. Goldberg concedes that the conspiracy cause of action is not properly pled. Accordingly, the Court grants Cablevision's motion to dismiss the claim brought pursuant to 42 U.S.C. § 1985.

### 4) As to the Claims Brought Pursuant to State Law—The Second and Third Causes of Action

Goldberg alleges two state-law causes of action against Cablevision: a breach of contract claim and a claim that Cablevision violated N.Y. Pub. Serv. L. § 229(3). Assuming that the Court would grant the remainder of its motion and dismiss Goldberg's federal causes of action against it, Cablevision asks the Court to decline to exercise supplemental jurisdiction over the state-law claims. However, even if the Court dismisses the federal claims brought against Cablevision, a Section 1983 claim against the Town and the NYSPSC and a request for relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, remain pending. Due to the existence of viable federal causes of action, the Court will retain jurisdiction over the state-law causes of action against Cablevision.

### B. The Motion by Goldberg for Leave to File an Amended Complaint

Although Goldberg concedes that his original conspiracy cause of action failed to state a claim upon which relief could be granted, he now cross-moves for leave to file a second amended complaint. Cablevi-

sion opposes his motion on the ground that his proposed amendment would be futile. At the outset, the Court notes that the amended complaint and the second amended complaint are identical except for the allegations regarding the claim brought pursuant to 42 U.S.C. § 1985.

■ Leave to file an amended complaint "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). Only "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party ... [or] futility of amendment" will result in the court's denial of a motion for leave to amend. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Dougherty v. Town of North Hempstead Board of Zoning Appeals,* 282 F.3d 83 (2d Cir.2002); *Milanese v. Rust–Oleum,* 244 F.3d 104, 110 (2d Cir.2001). Cablevision's only basis for opposing Goldberg's amendment is its alleged futility.

■ Where, as here, a plaintiff's motion for leave to amend is filed in response to a motion to dismiss under Fed.R.Civ.P. 12(b)(6), "leave to amend will be denied as futile only if the proposed new claim cannot withstand a 12(b)(6) motion to dismiss for failure to state a claim, *i.e.,* if it appears beyond doubt that the plaintiff can plead no set of facts that would entitle him to relief." *Milanese,* 244 F.3d at 110 (citing *Ricciuti v. N.Y.C. Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991)). Thus, the question before the Court is whether Goldberg's proposed Section 1985 claim can withstand a Rule 12(b)(6) motion to dismiss for failure to state a claim.

In support of his proposed Section 1985 cause of action, Goldberg alleges that Cablevision conspired with the Town and NYSPSC to deprive him of "his right to cablecast programming on the public access channel." Goldberg claims that Ca-

blevision entered into the Franchise Agreement with the intention of controlling public access in a manner that enabled it to maximize profits while limiting and prohibiting public access to the maximum extent possible. According to the proposed second amended complaint, the Franchise Agreement allows Cablevision to exercise editorial control over the public access channel capacity, because the Agreement grants Cablevision unlimited power and control to write the rules and regulations for the administration of the PEG channel capacity. Goldberg further alleges that the revised Access User Contract and Access Rules deprives public access users of their "rights to be free from intimidation by the cable operator in their use of the public access channel capacity." The plaintiff contends that he informed the NYSPSC and the Town of this violation, but neither entity took action. Accordingly, Goldberg claims a violation of Section 1985.

Goldberg does not specify in his proposed second amended complaint which subsection of Section 1985 has been violated. Section 1985(1) pertains to preventing an officer from performing his duties; Section 1985(2) pertains to obstructing justice by intimidating a party, witness, or juror; and Section 1985(3) pertains to depriving persons of their rights or privileges. Given the factual allegations set forth in the proposed amended complaint, the Court finds that Section 1985(3) is the only relevant subsection.

■ To state a cause of action under Section 1985(3), a plaintiff must allege (1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a

right or privilege of a citizen of the United States. *See Thomas v. Roach,* 165 F.3d 137, 146 (2d Cir.1999). Significantly, the conspiracy must also be motivated by " 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Thomas,* 165 F.3d at 146 (quoting *Mian v. Donaldson, Lufkin & Jenrette Secs., Corp.,* 7 F.3d 1085, 1088 (2d Cir.1993)); *see Gyadu v. Hartford Ins. Co.,* 197 F.3d 590, 592 (2d Cir.1999). In addition, the plaintiff must allege that the conspiracy was " 'aimed at interfering with rights' that are 'protected against private, as well as official, encroachment.' " *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 268, 113 S.Ct. 753, 758, 122 L.Ed.2d 34 (1993) (quotation omitted).

■ Here, Goldberg makes no allegations that Cablevision, the Town, and the NYSPSC acted with race-based discriminatory animus. In addition, the only class to which Goldberg could belong would be that of public access channel programmers, which, to date, has not been found to be a class protected by Section 1985(3). Indeed, "[w]hatever may be the precise meaning of 'class' for purposes of [§ 1985(3) ], the term unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors." *Bray,* 506 U.S. at 269, 113 S.Ct. 753, 122 L.Ed.2d 34; *see United Brotherhood of Carpenters and Joiners of America, Local 610, AFL–CIO v. Scott,* 463 U.S. 825, 835, 103 S.Ct. 3352, 3360, 77 L.Ed.2d 1049 (1983) ("The predominate purpose of § 1985(3) was to combat the prevalent animus against Negroes and their supporters."); *LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 426–27 (2d Cir.1995) (religion satisfies the requirement of a class-based, invidiously discriminatory animus), *cert. denied,* 518 U.S. 1017, 116 S.Ct. 2546, 135 L.Ed.2d 1067 (1996).

Even if the provisions of Section 1985(3) were intended to protect a class consisting of public access channel programmers so as to satisfy the requirement of Section 1985(3), Goldberg still fails to allege that the defendants' conduct was motivated by hostility toward public access channel programmers. Rather, he contends that the defendants acted with the intent to control public access in a manner that enabled it to maximize profits while limiting and prohibiting public access to the maximum extent possible. The defendants' alleged motivation does not qualify as animus, much less class-based, invidiously discriminatory animus. Further, even if Goldberg had alleged some type of hostility on the part of the defendants, it would be economically motivated, and group actions resting on economic motivations are "beyond the reach of § 1985(3)." *United Brotherhood of Carpenters and Joiners,* 463 U.S. at 839, 103 S.Ct. at 3361.

In sum, Goldberg's proposed Section 1985(3) cause of action could not withstand a 12(b)(6) motion to dismiss for failure to state a claim. As such, his motion for leave to file a second amended complaint in regard to that cause of action is denied as futile. *See Milanese,* 244 F.3d at 110.

**C. The Motion for a Preliminary Injunction**

Goldberg moves for a preliminary injunction against Cablevision directing them to cablecast all of the plaintiff's future public access television programming without requiring that he sign an Access User Contract, unless the program contains content within the statutory exception. Initially, the Court notes that the claims brought pursuant to 47 U.S.C. § 531(e), and 42 U.S.C. § 1985(3) have been dismissed. As such, the only claims remaining against Cablevision are a breach of contract cause of action, a claim that

Cablevision violated N.Y. Pub. Serv. L. § 229(3), and a claim pursuant to the Declaratory Judgment Act. Accordingly, the motion for a preliminary injunction will be analyzed only in regard to these remaining causes of action. The Court further notes that neither party has requested a hearing, and the Court finds that no hearing is required.

A preliminary injunction is considered an "extraordinary" remedy that should not be granted as a routine matter. *See JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 80 (2d Cir.1990); *Hanson Trust PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264, 273 (2d Cir.1986); *Wandyful Stadium, Inc. v. Town of Hempstead*, 959 F.Supp. 585, 591 (E.D.N.Y.1997). Ultimately, however, the decision to grant or deny this "drastic" remedy rests in the district court's sound discretion. *See American Exp. Fin. Advisors, Inc. v. Thorley*, 147 F.3d 229, 231 (2d Cir.1998); *Molloy v. Metropolitan Transp. Auth.*, 94 F.3d 808, 811 (2d Cir. 1996).

In the seminal case of *Jackson Dairy, Inc. v. HP Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam), the Court of Appeals set forth the applicable standard in this Circuit to obtain preliminary injunctive relief. According to *Jackson Dairy*, the movant must clearly establish the following: "(a) irreparable harm; and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and the balance of hardships tips in favor of the movant." *Id.; see also, Alliance Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A.*, 143 F.3d 688, 696 (2d Cir.1998); *Maryland Casualty Co. v. Realty Advisory Bd.*, 107 F.3d 979, 984 (2d Cir.1997).

A showing of irreparable harm is considered the "single most important requirement" in satisfying the standard. *See Alliance Bond Fund, Inc.*, 143 F.3d at 696; *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir.1990) (recognizing that "irreparable harm is the single most important prerequisite for the issue of a preliminary injunction"). "A moving party must show that the injury it will suffer is likely and imminent, not remote or speculative, and that such injury is not capable of being fully remedied by money damages." *National Ass'n for Advancement of Colored People, Inc. (NAACP) v. Town of East Haven*, 70 F.3d 219, 224 (2d Cir.1995) (citing *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir.1989)). The movant must establish more than a mere "possibility" of irreparable harm. Rather, he must show that irreparable harm is "likely" to occur. *JSG Trading Corp.*, 917 F.2d at 79.

The Court finds no basis for Goldberg's assertion that unless the Court directs Cablevision to cablecast his programs without obtaining a signed and unaltered Access User Contract, his programs will not be cablecast. As the Court found above, the only reason that Goldberg's programs are not currently being cablecast on Cablevision's public access channel is that Goldberg refuses to sign an unaltered Access User Contract. Further, Cablevision has presented the Court with affidavits and exhibits demonstrating that on April 20, 2001 Goldberg's wife, Barbara Goldberg ("Mrs.Goldberg") submitted a signed Access User Contract and Access User Application and submitted three programs, which Goldberg produced, for cablecasting. Cablevision cablecast all three of these programs in April and May 2001. Goldberg does not deny that his wife has submitted his programs or that Cablevision has cablecast all the material she submitted on his behalf. In sum, the Court finds that Goldberg has failed to demonstrate a likelihood of irreparable harm, because his programs are still being cable-

cast and, if they are not, it is because he has failed to submit a signed and unaltered contract.

Goldberg's reliance on *Moss v. Cablevision*, 22 F.Supp.2d 1 (E.D.N.Y.1998), is misplaced. In *Moss*, this Court found that the plaintiff would suffer irreparable harm, because unless the Court directed Cablevision to air the plaintiff's programs, the ideas and positions of the Marijuana Reform Party would not be cablecast during the 60 days preceding the November 1998 election. This case does not involve the immediacy present in *Moss*. More importantly, in *Moss*, the plaintiff had no power to cablecast his programs other than obtaining a court order. Here, however, it is clear that any injury Goldberg is suffering is self-inflicted. Given that Cablevision is cablecasting all of Goldberg's programs when Mrs. Goldberg submits them with a signed and unaltered Access User Contract, it is clear that he does not need a preliminary injunction, which is extraordinary relief, to have his voice and views cablecast on Cablevision. In addition, he need only submit a signed and unaltered Access User Contract to have direct and full use of Cablevision's public access channel. Given that the only objection Goldberg has to Cablevision's Access User Contract is that it does not contain his proposed language, it appears that he is amenable to the provisions of an unaltered Access User Contract. Accordingly, the Court finds that Goldberg has failed to demonstrate a likelihood of irreparable harm, and his motion for a preliminary injunction is denied with leave to renew upon a showing that he has submitted a signed and unaltered Access User Contract, and that Cablevision still refuses to cablecast his programs.

### III. *CONCLUSION*

Having given the parties an opportunity for oral argument, and based on the foregoing it is here

**ORDERED,** that Cablevision's motion to dismiss the complaint pursuant to Fed. R.Civ.P. 12(b)(6) is **GRANTED** in regard to the first and fifth causes of action, for violations of 47 U.S.C. § 531(e) and 42 U.S.C. § 1985(3) respectively; and it is further

**ORDERED,** that Cablevision's motion to dismiss the complaint pursuant to Fed. R.Civ.P. 12(b)(6) is **DENIED** in regard to the second, third, and fourth causes of action; and it is further

**ORDERED,** that Goldberg's motion to file a second amended complaint in regard to the Section 1985(3) cause of action is· **DENIED**; and it is further

**ORDERED,** that Goldberg's motion for a preliminary injunction is **DENIED**, with leave to renew upon a showing that he has submitted a signed and unaltered Access User Contract, and that Cablevision still refuses to cablecast his programs; and it is further

**ORDERED,** that the parties are directed to report to United States Magistrate Judge E. Thomas Boyle forthwith to proceed with discovery.

**SO ORDERED.**